UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ARTHUR MAZLISH,

       Plaintiff,      04 Civ. 3943 (HB)

  -against-        **OPINION & ORDER**

BRANCH 36, NATIONAL ASSOCIATION OF
LETTER CARRIERS AFL-CIO, and
UNITED STATES POSTAL SERVICE,

       Defendants.
------------------------------------------------------------------------X

**Hon. HAROLD BAER, Jr., District Judge:**

  On May 25, 2004, Plaintiff, Arthur Mazlish ("Mazlish"), filed the instant action against Defendants, Branch 26 of the National Association of Letter Carriers AFL-CIO ("Union" or "Branch 36"), for breach of its duty of fair representation, implied under the National Labor Relations Act, 29 U.S.C. § 159(a), and the United States Postal Service ("USPS"), for breach of the collective bargaining agreement, under the Postal Reorganization Act, 29 U.S.C. § 1208(b). Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion for summary judgment is GRANTED.

## I. BACKGROUND

### A. Arthur Mazlish

  Mazlish has been a government employee for over forty-five years. From approximately 1964 to 1995, Mazlish was a full-time New York City public school teacher. (Dep. Mazlish, at 25:6 - 20.) At the same time, and since May 31, 1958, Mazlish has worked for the USPS. (Decl. Edward Mazlish, Att'y for Pl., Ex. A, Dec. 2, 2004 Dep. of Mazlish, at 6:11 – 15) (herein, "Dep. Mazlish".) The first part of Mazlish's postal service career, from 1958 to 1970, was spent as a clerk. (Dep. Mazlish, at 7:18 – 8:15.) On or about April 4, 1970, Mazlish was converted from a clerk, to an hourly rate, "regular city carrier," and assigned to the USPS facility at Grand Central Station, Manhattan. (Decl. Vanessa Duncan-Smith ("Smith"), Manager Personnel Services USPS, Ex. A, "Notification of Personnel Action.")

  Mazlish was also designated as a "part time regular." (Decl. Peter DeChiara, Att'y for Union ("Decl. DeChiara"), at Ex. 1.) Typically, a "part time regular" was assigned a twenty

1

hour per week schedule. Over time, however, Mazlish had been able to increase the number of assigned hours and, according to Mazlish, he averaged between six and eight hours per day. (Dep. Mazlish, at 7:18 – 8:15.)

In 1995, Mazlish retired from his career as a New York City public school teacher and wanted to expand the number of hours he worked for the USPS. (Dep. Mazlish, at 7:18 – 8:15.) To determine how he could increase his hours, Mazlish sought the advice of his supervisor, Michael Pasc ("Pasc"). (Dep. Mazlish, at 149:15 – 25.) Pasc informed Mazlish that his work designation could be converted from "part-time regular" to "regular full-time" but "[t]here's a process. . . . [Y]ou have to become a sub and Mr. Pasc advised me not to go that route." (Dep. Mazlish, at 199:10 - 12.) On Pasc's advice, Mazlish decided not to change his "part-time" status to "full-time" so as to maintain his seniority and other benefits. (Dep. Mazlish, at 25:15 – 26:4.)

However, on May 5, 2003, Mazlish was informed by Pasc that he would no longer be able to work the six to eight hours to which he had become accustom:

> [B]ecause of reorganization of the Postal Service, they had been retesting and reorganized, he said my services would no longer be needed for more than four hours per day. And that was starting immediately. You know, not in a month or so, it was immediately to be done.

(Dep. Mazlish 39:5 – 11.) Upset, the very same day, and at the suggestion of the shop steward, Michael Giltannen ("Giltannen"), Mazlish submitted a grievance to the Union regarding the decision to limit his employment to four hours per day. (Dep. Mazlish, at 40:1 – 42:19.)

**B.**     **USPS & Union Labor Agreement**

USPS is an independent entity associated with the executive branch of the United States Government, see 39 U.S.C. § 201, and the Union is a local affiliate of the National Association of Letter Carriers ("NALC"), a national labor organization that serves as the collective bargaining agent for letter carriers. (Decl. Patrick McNally, VP of NALC, ("McNally") at ¶ 2.) Branch 36 serves letter carriers employed at USPS facilities in Manhattan and the Bronx. (Decl. McNally at ¶ 3.)

The agreement between the USPS and NALC (the "CBA" or the "Agreement") sets-forth the terms and conditions of letter carriers' employment. The CBA defines the difference between "part-time" and "full-time" employment as follows:

> Full-Time. Employees in this category shall be hired pursuant to such procedures as the Employer may establish and shall be assigned to regular schedules consisting of five (5) eight (8) hour days in a service week.
>
> Part-Time. Employees in this category shall be hired pursuant to such procedures as the Employer may establish and shall be assigned to regular schedules of less than forty (4) hours in a service week, or shall be available to work flexible hours as assigned by the Employer during the course of a service week.

(Decl. of Valerie Rooks, USPS Labor Relations Specialist ("Rooks"), Ex. A, USPS and NALC Agreement for 2001-2006 (herein, "Ex. A"), at Art. 7§ 1.A.2.)

The CBA includes a multi-stage "Grievance" procedure. (Decl. Rooks, Ex A. at Art. 15.1 -- 5.) If grievances cannot be resolved by "Step A,"[1] they may be appealed to "Step B,"[2] which consists of an alternative dispute resolution team composed of a NALC representative, appointed by the president of NALC, and a USPS representative. (Decl. Rooks, Ex A. at Art. 15.2 Step B.) According to the Memorandum of Understanding, an agreement between USPS and NALC which define the terms of employment (herein, "MOU"), Step B, or the alternative resolution team, has a defined function:

> The primary role of the Step B Dispute Resolution Team is to decide the grievance presented to them and to communicate the basis for the decision to the parties at Step A, using a format agreed upon at the national level.

---

[1] According to Article 15 Section 2 of the CBA, Step A:
   (a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. This constitutes the Informal Step A filing date. The employee, if he or she desires, may be accompanied and represented by the employee's steward or a Union representative. During the meeting, the parties are encouraged to jointly review all relevant documents to facilitate resolution of the dispute. The Union also may initiate a grievance at Informal Step A within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case, the participation of an individual grievant is not.
(Decl. Rooks, Ex. A, at Art. 15§ 2.A)

[2] According to Article 15 Section 2 of the CBA, Step B:
   (b) The Step B Team will review the appeal and issue a joint report of the decision and any supporting findings within fourteen (14) days of receipt of the appeal at Step B unless the parties mutually agree to extend the fourteen (14) day period. The Step B team will give priority consideration to discussion and decision of removal cases. It is the responsibility of the Step B team to ensure that the facts and contentions of grievances are fully developed and considered, and resolve grievances jointly. The Step B team may 1) resolve the grievance, 2) declare an impasse, 3) hold the grievance pending resolution of a representative case or national interpretive case or 4) remand the grievance with specific instructions.
(Decl. Rooks, Ex. A, at Art. 15§ 2.A)

(Decl. McNally, Ex A., MOU, at 180.) However, while the Step B Dispute Resolution Team (herein, "Step B Team") has the authority under the Agreement to resolve grievances, "the Agreement does not provide for any appeal of a grievance that is denied by the Step B Team" and "such a denial is final and binding." (Decl. McNally, at ¶ 5.)

**C. Grievance Proceedings**

Following Mazlish's grievance submission, on May 15, 2003, the Union presented the grievance to Step A on Mazlish's behalf. (Dep. Mazlish, at 64:7 – 9.) The Union maintained that, while Mazlish was a "part-time regular," USPS established a past practice when it permitted Mazlish to work full-time for many years. (Dep. Mazlish, at 64:19 - 25.) The Step A Grievance Procedure proved unsuccessful and Mazlish's grievance was denied. (Dep. Mazlish, at 74:9-11.)

On behalf of Mazlish, and in accordance with the CBA's grievance procedures, the Union appealed the matter to Step B. (Dep. Mazlish, at 74:17 - 19.) The Union reiterated the argument presented at Step A.[3] On August 12, 2003, the Step B Team denied Mazlish's grievance. According to the Step B Team, the CBA provided USPS with the express authority to assign a "part-time regular" to less than forty hours per week and, therefore, "Management did not violate [A]rticle 5 of the National Agreement by not allowing the Grievant, a PTR, to continue to work 8 hours a day." (Decl. DeChiara, at Ex. 11, Step B Decision.)

On October 28, 2003, "[o]n the advice of counsel," Mazlish drafted and sent a letter to the Union referring to the portions of the MOU that he believed were pertinent to his claim. (Dep. Mazlish, at Ex. 12, Ltr. from Mazlish to Orapello, dated Oct. 28, 2003.) In particular, Mazlish pointed to the pertinent MOU sections that define the relationship between full-time and part-time employment and argued that the MOU proved that the Step B determination "was clearly erroneous as a matter of law and should be reversed." (Dep. Mazlish, at Ex. 13; Decl. McNally, Ex A., MOU, at 157.) On November 25, 2003, the Union responded to Mazlish's October 28, 2003 letter:

---

[3] In particular, the Union argued:
> The Grievant is a Part Time Regular at Grand Central station. The Grievant stated that for the last 14 years, he has been working at least eight hours a day, everyday that he reported to work. Over the last four years, the Grievant explained that he had been asked to work overtime four days a week. On May 15, 2003, the Grievant was informed that he was only going to be allowed to work four hours a day. The Grievant believes that this decision is arbitrary given the fact that his station is very large and that one person can always be fitted into a job assignment, as he has been over the last four years. The Grievant cites that because of past practice he should be grandfathered into an eight-hour slot.

(Decl. DeChiara, at Ex. 11, Step B Decision.)

4

> You have already grieved this issue. The Dispute Resolution
> Team has rendered a decision on this matter. Their decision is
> final and binding.

(Dep. Mazlish, at Ex. 15, Ltr. from Union to Mazlish, dated Nov. 25, 2003.)

**D.   Procedural History**

On January 5, 2004, Mazlish filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") and claimed that the Union "had failed and refused to further process a grievance on behalf of its member." (Dep. Mazlish, at Ex. 17, Unfair Labor Practice Charge, dated Jan. 5, 2004.) After an investigation, on March 26, 2004, the NLRB Regional Director ("Regional Director") dismissed Mazlish's charge because "the evidence fails to establish that the Union breached its duty of fair representation owed to you in this matter." (Dep. Mazlish, at Ex. 20, Ltr. from NLRB to Mazlish, dated Mar. 26, 2004). In particular, the Regional Director determined that Mazlish failed to demonstrate that the Step B Team, or the grievance process, "was influenced by any arbitrary, invidious, or otherwise unlawful considerations." (Dep. Mazlish, at Ex. 20.)

Mazlish appealed the Regional Director's decision to NLRB's General Counsel ("General Counsel"). (Dep. Mazlish, at Ex. 22, Ltr. from Mazlish to NLRB, undated.) The General Counsel also rejected Mazlish's appeal "for the reasons set forth in the Regional Director's letter of Apr. 14, 2004." (Dep. Mazlish, Ex. 21, Ltr. from NLRB to Mazlish, dated May 28, 2004.) The General Counsel determined that "although you are dissatisfied with the manner in which the Union presented your grievance, no violation of the Act occurred since the Union's conduct was not based on . . . unlawful considerations." (Dep. Mazlish, at Ex. 21.)

Before he received the General Counsel's rejection letter, on May 25, 2004, Mazlish filed the instant action and alleged, inter alia, that the reduction in hours violated the terms of the CBA (Compl. ¶¶ 20, 32), the Union breached its duty of fair representation (Compl. ¶ 36), including Union's decision to not pursue the grievance beyond the Step B decision. (Compl. ¶¶ 27, 28).

Defendants now move for summary judgment pursuant to Federal Rules of Civil Procedure 56.

II.   **STANDARD OF REVIEW**

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

5

Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. Donahue, 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.   DISCUSSION

#### A. Hybrid Claims

A "hybrid claim" is one where "an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both." Carrion v. Enter. Ass'n, Metal Trades Branch Local Union, 227 F.3d 29, 34 (2d Cir. 2000). In the case at bar, the hybrid claim consists of two separate claims: "one against the plaintiff's employer for an alleged breach of a collective bargaining agreement in violation of the [Labor Management Relations Act] § 301 and another against the plaintiff's union for breach of the union's duty of fair representation." Kavowras v. N.Y. Times Co., No. 00 Civ. 5666, 2004 WL 1672473, at *5 (S.D.N.Y. Jul. 26, 2004) (Baer, J.) (citing to DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164 (1983)).

As noted by the Second Circuit in Carrion, while the two claims are independent, they are also "inextricably linked." Indeed, "[t]o prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." Kavowras, 2004 WL 1672473, at *5 (citing to DelCostello, 462 U.S. at 164). The success of the employees § 301 action against an employer is contingent, in part, upon the employee's ability to sufficiently demonstrate "that the union breached its duty of fair representation in its handling of his

6

grievance." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990); see also King v. N.Y. Tel. Co., Inc., 785 F.2d 31, 36 n. 2 (2d Cir. 1986) ("[I]t is not until a union breaches its duty of fair representation that an employee has all the necessary elements of a claim against the employer for breach of contract."). Conversely, where, "it is shown that the union fairly represented the employee, the suit against the employer cannot stand." Kavowras, 2004 WL 1672473, at *5 (citing to Flynn v. Prudential Ins. Co. of Am., No. 95 Civ. 113, 1996 WL 294302, at *5 (S.D.N.Y. Jun. 3, 1996).

Here, Mazlish filed a claim pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 et seq., against USPS for breach of the Agreement, and the Union, for breach of the duty of fair representation. As such, Mazlish's allegations present a hybrid § 301/fair representation claim. See Tomney v. Int'l Ctr. for the Disabled, No. 02 Civ. 2461, 2003 WL 1990532, at *5 (S.D.N.Y. Apr. 29, 2003).

**B. Statute of Limitations**

The Union moves for summary judgment and argues, inter alia, that Mazlish's hybrid claims are barred by the applicable statute of limitations. Plaintiff opposes the Union's motion and asserts that the Complaint was filed within the requisite 6 months. Plaintiff contends this is so due to the fact that: (1) the Defendants failed to provide notice of the Step B Team's decision; and, (2) Defendants failed to sufficiently articulate that the Step B Team's decision was "final and binding." The issue for me to determine is when the statute of limitations began to run.

In DelCostello, 462 U.S. at 169, the Supreme Court held that hybrid suits brought by employees against employers, pursuant to Section 301 of the Labor Management Relations Act, and against unions, for breach of duty of fair representation, are governed by a six-month statute of limitations as articulated in Section 10(b) of the National Labor Relations Act. See 29 U.S.C. § 160(b)(1994); see, also, White v. White Rose Food, 128 F.3d 110, 113 - 15 (2d Cir. 1997); Campbell v. Kane, Kessler, P.C., No. 02 Civ. 1680, 2004 WL 1234048, at *5 (S.D.N.Y. Jun. 2, 2004). It is uncontested that the six-month limitation period applies to this case, however, the parties dispute when the statute of limitations began to accrue. In accordance with Second Circuit precedent, the statute of limitations "is counted from the time when the union member knew or reasonably should have known that a breach of the duty of fair representation had occurred." Kavowras v. New York Times Co., 328 F.3d 50, 55 (2d Cir. 2003) (emphasis added); see also, Campell, 2004 WL 1234048, at *5 ("the limitations period accrues when the plaintiff

7

knew or reasonably should have known that a breach occurred") (citation omitted).

Mazlish filed this lawsuit on May 25, 2004, over nine months after the Step B Team decision was issued on August 12, 2003.

### 1. *Sufficient Notice*

First, Mazlish urges that the statue of limitations be tolled through November 25, 2005 because that was the first day he received "actual notice" of the Step B Team's decision.[4]

Despite Plaintiff's position, his own deposition indicates actual receipt of the Step B Team's decision before November 25, 2005: "Q: When did you first see [the August 12, 2003 Step B Decision]? A: About a week after [it was issued], a week, week and a half, two weeks." (Dep. Mazlish, at 79:22 – 25.) The testimony indicates that, at the latest, Mazlish received an actual copy of the Step B Team's decision by September 1, 2003.

In addition, pursuant to the Second Circuit's decision in Demchik v. Gen. Motors Corp., 821 F.2d 102 (2d Cir. 1987), Mazlish's argument that he failed to receive "actual notice" does not warrant a tolling of the statute of limitations because "the statute of limitations begins to accrue . . . when the employee had actual or constructive notice that the union has breached its duty of fair representation." Demchik, 821 F.2d at 105 (2d Cir. 1987) (emphasis added); see also Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 165 (2d Cir. 1989).

Turning to the constructive notice argument, Mazlish had constructive notice on, or before, October 28, 2003. The October 28, 2003 letter from the Plaintiff, which purports to demonstrate the Union's mistakes, was not "a second grievance," or "a new grievance," according to Mazlish but, rather, "a redress or an amendment to the original agreement . . . there was only one grievance involved here." (Dep. Mazlish, at 225:3 - 9; 225:22 – 25; at Ex. 12.) Mazlish could not have redressed or amended his grievance without the benefit of the Step B Team's decision. Indeed, it was a consequence of the Step B Team decision that Mazlish drafted the letter as a de facto appeal, an attempt to obtain a better result.

---

[4] It should be noted that the letter/appeal to the NLRB does not toll the statute of limitations. Quite the contrary; oftentimes, the filing of an NLRB charge commences the statute of limitations. See, e.g., Kavowras, 328 F.3d at 55; Santos v. Dist. Council of NYC & Vicinity of United Bhd. of Carpenters and Joiners, 619 F.2d 963, 969 (2d Cir. 1980). See also Arriaga-Zayas v. Int'l Ladies' Garment Workers' Union – P.R. Council, 835 F.2d 11, 13-14 (1st Cir. 1987); Conley v. Int'l Bhd. of Elec. Workers, Local 639, 810 F.2d 913, 915-16 (9th Cir. 1987); Adkins v. Int'l Union of Elec., Radio, & Mach. Workers, 769 F.2d 330, 335 (6th Cir. 1985); Kolomick v. United Steelworkers of Am., Dist. 8, 762 F.2d 354, 355-57 (4th Cir. 1985). Here, since Mazlish knew, or reasonably should have known, about the Step B Team's decision, the NLRB letter/appeal does not serve to toll the statute of limitations pending a decision.

According to both Mazlish's deposition testimony and his October 28 letter, he had constructive notice, at the very latest, by the date of his letter.

### 2. *Sufficient Detail*

Mazlish also maintains that "even where an employee has actual notice that a grievance has been denied, the statute of limitations does not begin to run until the union gives notice that it will take the grievance no further." (Pl. Mem. of Law. In Op. to Summ. J. at 8.) Since the Complaint was filed on May 25, 2004 it is not barred by the statute of limitations and, according to Plaintiff, this is because the Union's notice that no further action would be taken arrived on November 25, 2003, just six months prior to the filing of the Complaint and within the appropriate six month period.

However, the facts and law belie Mazlish's second contention as well. According to the Second Circuit, despite a grievant's "hopes of future representation by [a] union," if a grievant is aware that a union will no longer pursue a grievance, such "knowledge [is] sufficient to start the statute of limitations running." Cohen v. Flushing Hosp. & Med. Ctr., 68 F.3d 64, 67 (2d Cir. 1995). The Second Circuit does not require actual notice but, rather, the statute of limitations on a Union breach of duty action begins to accrue when such action by the Union becomes apparent to the Union member. See Ghartey, 869 F.2d at 165.

Here, assuming *arguendo* that Mazlish received on November 25, 2003 notice that the Union would "take the grievance no further" (Pl. Mem. of Law. In Op. to Summ. J. at 8), he was aware of the Union's decision way back in August or September 2003. See Cohen, 68 F.3d at 67. This is clear from Mazlish's testimony about conversations with a Union Officer, Pat Lucas ("Lucas"), and shop steward, Giltannen. The conversation, as I read the record, indicates that Giltannen advised Mazlish "a couple of days, maybe two days, [or] three days [after the August 12, 2003 letter had been received]" (Mazlish Dep. 81:11 – 12), that his grievance had been "resolved and it's binding and, you know, there's no further negotiations to be considered." (Dep. Mazlish, at 81:15 - 18.) Mazlish acknowledged that he understood Giltannen's statements that the decision "was final and binding" and "that was as far as the union was going to go with the matter." (Dep. Mazlish, 83:4 – 7.) In addition, about "the end of August [or] the beginning of September" (Dep. Mazlish, 85:22 – 24), Lucas reiterated Giltannen's advice to Mazlish: "He said that [the Step B's decision] was final and binding." (Dep. Mazlish, at 86:5 - 2.)

Between the conversations with Lucas and Giltannen, and the August 12, 2003 Step B

9

Team decision, Mazlish was aware that the Union would take his grievance no further at least by the end of September 2003 and the statute of limitations would have run a month before the Complaint was filed.

### 3. *Equitable Estoppel*

Although not explicit in the Mazlish's opposition, an argument that the statute of limitations should be tolled pursuant to the doctrine of equitable estoppel because of the alleged representations by the Union, which, in turn, caused Mazlish to delay the filing of this lawsuit, also fails. "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." Tomas v. Gillespie, No. , 2005 WL 22850, at *6 (S.D.N.Y. Jan. 5, 2005) (citing Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984)).

Mazlish cannot demonstrate that the Step B Team's decision or either Union official, Giltannen or Lucas, misrepresented any issue of fact. To the contrary, according to Mazlish himself, both Giltannen and Lucas conveyed the correct information – that the Union would not pursue his grievance any further then the Step B Team's decision. The two conversations with Union officials in conjunction with the August 12, 2003 letter, indicate that Mazlish was clearly aware, or should have been aware, that that the Union would make no further appeals, thereby triggering the statute of limitations.

In sum, Defendants have sufficiently demonstrated that there is no genuine issue of material fact that the statute of limitations began to run before November 25, 2003. Therefore, I conclude that Mazlish's claim is barred by the applicable statute of limitations because Mazlish failed to initiate this lawsuit within six months of the time he reasonably should have known that no further action would be taken on his grievance.[5]

### IV. **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is hereby GRANTED. The Clerk of Court is instructed to CLOSE this motion and REMOVE this case from my docket.

SO ORDERED:

/s/ Harold Baer, Jr.

Date: 5/26/05

---

[5] As in Evans v. Eastern Air Lines, Inc., No. 88 Civ. 5504, 1990 WL 625172 (S.D.N.Y. Apr. 30, 1990), "[t]he Union has also moved for summary judgment on the merits of plaintiff's duty of fair representation claim. However, because of the Court's disposition of the statute of limitations question, the Court need not reach the merits of plaintiff's claim against the Union."

10